**John F. McGUIRE, Appellant,**

v.

**Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.**

No. 96–215.

United States Court of Veterans Appeals.

June 30, 1998.

Jeffrey J. Wood, York, PA, was on the brief for appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; and Mary Ann Flynn, Washington DC, were on the brief for appellee.

Before NEBEKER, Chief Judge, and IVERS and GREENE, Judges.

NEBEKER, Chief Judge:

The appellant, John F. McGuire, appeals from a November 27, 1995, Board of Veterans' Appeals (BVA or Board) decision denying service connection for cancers of the esophagus and stomach. The issue is whether the Secretary's regulation defining the statutory phrase "occupation of Hiroshima and Nagasaki, Japan" unlawfully requires the veteran to have performed "official military duties" in those cities. For the following reasons, the Court will uphold the regulation and affirm the Board's decision.

## I. FACTS

The appellant served in the 90th Naval Construction Battalion (90th NCB), U.S. Navy, from April 1945 to May 1946, and his available service medical records, including his separation examination report, do not record any cancer. Record (R.) at 20. According to the Defense Nuclear Agency (DNA), the 1973 fire at the National Personnel Records Center destroyed most of the appellant's service records. R. at 91. However, the DNA did state that the 90th NCB was stationed in Yokoska, Japan, over 400 miles from Hiroshima and 550 miles from Nagasaki. R. at 53, 91. The appellant has asserted that his military duties required him to venture close to both Hiroshima and Nagasaki. Additionally, the appellant stated that he had visited those cites while on weekend leave. R. at 107, 175–76. Based upon the appellant's assertion respecting where his official duties sent him, the DNA stated: "All of these cities are located hundreds of miles from both Hiroshima and Nagasaki, except Okayama, which is approximately 100 miles from Hiroshima." R. at 186.

Almost 40 years after leaving Japan, the appellant filed claims for service connection for esophageal and stomach cancers that he alleged were caused by his exposure to radiation while he was in Japan. R. at 44–37. The appellant submitted medical evidence

that showed he suffered from esophageal and stomach cancer, but none of this evidence established the etiology of his cancers. R. at 56, 59–73, 78–89. In March 1990, the RO denied the appellant's claims because there was no evidence that the appellant had received enough radiation exposure to be considered for service connection on that basis. R. at 93–94. However, in a June 1992 decision, the BVA remanded the appellant's claims to the RO for an analysis of his exposure due to his weekend trips to Hiroshima and Nagasaki. R. at 150–52.

On remand, the DNA found that the dose estimate from an eight-hour visit on the day that occupation forces first arrived at either city would have been less than 0.001 rem. R. at 186. Using this dose estimate and assuming that the appellant had spent two full weekend days in both Hiroshima and Nagasaki, a VA Assistant Chief Medical Director estimated the appellant's maximum exposure at 0.012 rem. That Assistant Chief Medical Director noted that, at such a low exposure level, it was unlikely that the appellant's cancer could have been caused by ionizing radiation. R. at 225. The Compensation and Pension Director agreed, and the RO confirmed its previous denial of service connection for the appellant's esophageal and stomach cancers. R. at 228–30.

In the BVA decision here on appeal, the Board found that the veteran's official military duties did not take him closer than 100 miles from Hiroshima. Additionally, the Board found that visiting Hiroshima and Nagasaki while on liberty did not qualify as a radiation risk activity, and, consequently, the Board held that the appellant's "esophageal cancer with metastatic involvement of the stomach may not be service connected on a radiation-presumptive basis." R. at 13. Moreover, the Board found that none of the medical evidence addressed the etiology issue except for the Assistant Chief Medical Director's determination that, based on the DNA dose estimate, there was no connection between the appellant's cancer and his radiation exposure. Relying on this opinion, the Board denied the appellant's claims, finding that the preponderance of the evidence was against service connection for esophageal and stomach cancers.

## II. ANALYSIS

### A. General

Service connection for a condition which is claimed to be attributable to ionizing radiation exposure during service may be established in one of three different ways. *Ramey v. Brown*, 9 Vet.App. 40, 44 (1996), *aff'd sub nom. Ramey v. Gober*, 120 F.3d 1239 (Fed.Cir.1997). First, there are 15 types of cancer which are presumptively service connected. 38 U.S.C. § 1112(c). Second, 38 C.F.R. § 3.311(b) (1997) provides a list of "radiogenic diseases" which will be service connected provided that certain conditions specified in that regulation are met. Third, direct service connection can be established by "show[ing] that the disease or malady was incurred during or aggravated by service," a task which "includes the difficult burden of tracing causation to a condition or event during service." *Combee v. Brown*, 34 F.3d 1039, 1043 (Fed.Cir.1994). Initially, the Court notes that the thrust of the appellant's main argument is that he is entitled to service connection based upon the presumption provided in 38 U.S.C. § 1112(c). Because the appellant has declined to appeal the Board's denial of service connection based upon either section 3.311(b) or a direct showing of service connection, the Court deems the appellant to have abandoned those issues. *See Bucklinger v. Brown*, 5 Vet.App. 435 (1993). Thus, the issue here on appeal is whether the appellant is entitled to a presumption of service connection for his stomach and esophageal cancers under § 1112(c).

Qualification under the presumptive service connection provision of 38 U.S.C. § 1112(c) occurs when a veteran suffers from one of the fifteen listed cancers and establishes that he was a radiation exposed veteran. The relevant portions of § 1112(c)(3) state:

(A) The term "radiation exposed veteran" means (i) a veteran who, while serving on active duty, participated in a radiation risk activity . . .

(B) The term radiation risk activity means . . .

(ii) The occupation of Hiroshima or Nagasaki, Japan, by United States forces during the period beginning on August 6, 1945, and ending on July 1, 1946.

Under the authority of § 1112, the Secretary has promulgated 38 C.F.R. § 3.309(d)(3)(vi) (1997) which states:

The term "occupation of Hiroshima or Nagasaki, Japan, by United States forces" means official military duties within 10 miles of the city limits of either Hiroshima or Nagasaki, Japan, which were required to perform or support military occupation functions such as occupation of territory, control of the population, stabilization of the government, demilitarization of the Japanese military, rehabilitation of the infrastructure or deactivation and conversion of war plants or materials.

Therefore, it is clear that the regulatory definition of occupation expressly defines the application of the statutory presumption to "official military duties ... which were required to perform or support military occupation functions."

The appellant argues that the regulation's use of the phrase "official military duties" impermissibly limits the presumptive service-connection statute because application of the regulatory definition is contrary to the line of duty presumption found at 38 U.S.C. § 105(a). That statute does not draw a distinction between authorized leave or active duty for the purpose of whether the veteran incurred an injury or disease in the line of duty. Specifically, the appellant asserts that the regulation "annuls the statutory line-of-duty presumption in all cases where radiation exposed veterans occupied Hiroshima or Nagasaki while on liberty rather than official military duties." Appellant's Brief at 9. In other words, the appellant's argument depends upon the theory that he somehow participated in the occupation of those cities while on leave. Because this Court and VA have previously required the veteran's military duties to have been involved with the occupation of either Hiroshima or Nagasaki as defined by § 3.309(d)(3)(vi), see *Walls v. Brown,* 5 Vet.App. 46 (1993), the present case turns on whether that regulation impermissibly restricts the statutory phrase "occupation of Hiroshima and Nagasaki, Japan."

### B. Occupation

#### 1. Occupation and § 1112(c)

■ The Secretary of Veterans Affairs has authority under 38 U.S.C. § 501(a) to "prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws." Determining whether 38 C.F.R. § 3.309(d)(3)(vi) violates the Secretary's statutory authority requires examining the language of the statute and the interpretation adopted by the Secretary. *See Gardner v. Derwinski,* 1 Vet.App. 584, 586–87 (1991), *aff'd sub nom. Gardner v. Brown,* 5 F.3d 1456, 1458 (Fed.Cir.1993), *aff'd,* 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994). In analyzing a statute, we look at the overall structure of the statute and the specific language at issue. *Winn v. Brown,* 8 Vet.App. 510, 515 (1996). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where the plain meaning of a statute is discernible, that "plain meaning must be given effect unless a 'literal application of [the] statute will produce a result demonstrably at odds with the intention of its drafters.' " *Gardner,* 1 Vet. App. at 587 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993) (citing *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)); *see also United States v. Seven Miscellaneous Firearms,* 503 F.Supp. 565, 573 (D.D.C.1980) (common words in a statute should be given their common meaning).

■ Webster's Dictionary defines "occupation" as an "occupying or being occupied; specifically, the seizure and control of a coun-

try or area by military forces." WEBSTER'S NEW WORLD DICTIONARY 937 (3d College ed.1988). Thus, using the ordinary definition of the term "occupation," the statutory presumption is available only where the veteran participated in the seizure and control of Hiroshima and/or Nagasaki. Notably, Congress did not extend the presumption to U.S. forces occupying other areas of Japan. This Congressional intent to exclude veterans in other units who supported occupation of areas outside Hiroshima and Nagasaki from qualifying for the presumption is further evidenced by the time limitation stated in the statute: Congress limited the time period of the presumption to the period from August 6, 1945, to July 1, 1946. This time period begins, conservatively, when U.S. forces first created a potential radiation area by dropping an atomic bomb on Hiroshima. Occupation of Hiroshima by U.S. forces ended in March 1946, and U.S. troops left Nagasaki in June 1946. *See* H.R. REP No. 100-235, at 4, *reprinted in* 1988 U.S.C.C.A.N. 412, 414. Therefore, the termination date corresponds to the time when, historically, U.S. forces were no longer assigned to occupy those areas of Japan.

Reading the statute as a whole and using the plain meaning of the term "occupation" leads to the conclusion that the intent of the statute is to grant a presumption to those veterans who somehow participated in the seizure or control of Hiroshima and Nagasaki at a time when U.S. forces were assigned to occupy those cities. As to the identity of those veterans who qualify for the presumption under the statute, Congress chose an expansive definition. Congress could have specifically listed the individual units that were assigned to the occupation of Hiroshima or Nagasaki. More broadly, Congress could have just stated "all units that were assigned to the occupation of Hiroshima or Nagasaki." Instead, Congress delimitated a specific time period for qualifying occupation forces. Such a choice applies the presumption to any and all veterans who, although their units might have been officially occupying other areas of Japan, nevertheless actually participated in the occupation of Hiroshima or Nagasaki. Moreover, although Congress drafted the statute broadly enough to encompass some

veterans who had been officially assigned to areas outside of Hiroshima and Nagasaki but who nevertheless participated in the occupation of those cities, it is clear that the statute does not apply the presumption based merely upon the veteran's leisure presence in those cities. Thus, any regulation defining this statute must limit the application of the presumption based upon the following: (1) the type of duty performed ("participation in . . . the occupation"); and (2) the place where the claimant performed that duty ("Hiroshima or Nagasaki").

2. Occupation and § 3.309(d)(3)(vi)

■■■■ Regulations should be construed so as to harmonize them with the authorizing law. *Talley v. Derwinski,* 2 Vet.App. 282, 287 (1992) (citations omitted). The Court will sustain a regulation that is consistent with the language of the statute and is a plausible interpretation of that statute. *See Winn,* 8 Vet.App. at 515 (1996) (citing *Chevron,* 467 U.S. at 842-43, 104 S.Ct. 2778). Substantial deference is given to the Secretary's interpretation of a statute. *Id.* As to the regulation at issue here, the Secretary interpreted the statutory phrase "occupation of Hiroshima and Nagasaki" by a regulation that provides some examples of military functions that would demonstrate occupation of those cities. Those examples all describe activities that the Court holds to be consistent with the ordinary meaning of the term occupation as understood to connote military control of a geographical area. Further, the regulation applies the presumption to veterans whose duties "were required to perform or support military occupation functions." The Secretary's inclusion of military duties which "support" the occupation is not contrary to the language of the statute because the statute does not require the veteran to have actually "occupied" (seized and controlled) Hiroshima or Nagasaki, but rather only to have "participated in . . . the occupation."

Moreover, the regulatory limitation of activities to be performed "within 10 miles" of Hiroshima and Nagasaki is fully consistent with Congress's drafting the statute as broadly as possible with regard to occupation forces but still not extending the presump-

tion to all U.S. soldiers in Japan. Therefore, the Court holds that the Secretary's interpretation of the statutory phrase "occupation of Hiroshima and Nagasaki, Japan," to mean "official military duties ... which were required to perform or support military occupation functions" is an interpretation that is squarely within the meaning of the statute.

### 3. To be on leave

 Webster's Dictionary provides a relevant definition of "leave" as "permission to be absent from duty or work, especially such permission given to personnel in the armed services." WEBSTER'S NEW WORLD DICTIONARY 769. Simply, if a serviceman is on leave he has permission to be absent from some military duty. As discussed above, the duty requirement to qualify for the statutory, and the regulatory, presumption of service connection is the participation in the occupation of Hiroshima or Nagasaki. Despite the appellant's argument to the contrary, a veteran could have been on leave in Hiroshima and Nagasaki and still qualify for the presumption. This would occur when the veteran was "on leave from," in other words, had permission to be absent from, duties that involved the occupation of Hiroshima or Nagasaki. Thus, the Court notes that both the Secretary's regulation and the specific statute, section 1112(c), are consistent with the more general statutory line of duty presumption found at section 105(a). Therefore, as a matter of law, the Court holds that a veteran who visited either Hiroshima or Nagasaki while on leave from duty not related to the occupation of either city did not participate in the occupation of those cities as the term occupation is defined either by statute or by regulation.

### C. On Leave in Hiroshima and Nagasaki

 A determination that the veteran's military duties did not require him to participate in the occupation of Hiroshima of Nagasaki is a finding of fact that this Court reviews under a "clearly erroneous" standard of review. *See Walls*, 5 Vet.App. at 50. Under this standard of review, if there is a plausible basis in the record for the factual determinations of the BVA, the Court cannot overturn them. *Gilbert v. Derwinski*, 1 Vet.

App. 49, 53 (1990). Here, there is no dispute that the appellant visited both Hiroshima and Nagasaki exclusively while on weekend leave. The appellant's duty, from which he had permission to be absent, was service in the 90th NCB. As found by the DNA and the BVA, the 90th NCB was stationed in Yokoska, hundreds of miles from either Hiroshima or Nagasaki. Further, there is no dispute that the appellant's duties with the 90th NCB did not require him to participate in the occupation, as defined by the statute and interpreted by the regulation, of either Hiroshima or Nagasaki. Accordingly, there is a plausible basis in the record for the BVA's finding that the appellant's official military duties did not require him to participate in the occupation of either Hiroshima or Nagasaki. Since his duties do not qualify under the statute and regulation, his visiting those cities while being on leave from those duties also does not trigger the presumption. Consequently, the BVA's determination that the appellant's military duties did not entitle him to presumptive service connection for his cancers was not error.

### III. CONCLUSION

The November 27, 1995, decision of the Board is AFFIRMED.